**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>EFRAIN OROZCO and FERNANDO )<br>GUTIERREZ-PONCE,, )<br>)<br>Defendant. ) | Criminal Action<br>No. 10-03043-01/02-CR-S-RED |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendants' Motions to Suppress Evidence, to which the government responded. A hearing was held before the undersigned on February 23, 2011. Defendant Orozco was represented by David A. Healy, and Defendant Gutierrez-Ponce was represented by Robert F. Torp. Assistant United States Attorney David P. Rush appeared on behalf of the government.

Defendants submit that evidence obtained as a result of a commercial motor vehicle stop should be suppressed on the grounds that the officers lacked reasonable suspicion to justify the stop and subsequent search of the vehicle. They contend that the detention, search and seizure were illegal because there was not reasonable suspicion of criminal activity. Both defendants submit that they did not consent to the search of the vehicle, and that the search exceeded the scope of consent given by the driver of the vehicle.

The government first called Agent Rick Talbert, Missouri State Highway Patrol Commercial Motor Vehicle Officer. He elaborated on the duties of a commercial vehicle officer, and detailed the

types of investigations he could conduct. On March 20, 2010, he stopped defendants in a tractor trailer on I-44 in Greene County, Missouri. He stopped the vehicle because he was not familiar with the name of the company on the side of the truck. He often does this when he is not familiar with the company to make sure that the vehicle is in compliance with the commercial motor vehicle regulations for Missouri. He had not seen any traffic violation before he pulled the truck over. He approached the vehicle and identified himself to the driver, Fernando Gutierrez-Ponce. He told him what he wanted, and asked for his registration, his commercial driver's license, fuel license, his logbook, and medical certificate. He usually asks if there is someone else in the vehicle for his own safety, which he did in this case. Defendant Gutierrez identified defendant Efrain Orozco as his co-driver. Defendant Orozco was in the sleeper berth. Both of them provided the documents for which the officer asked, including log books and commercial drivers' licenses. Agent Talbert asked Gutierrez where he was coming from, and he said Ohio. He asked him about not having a load on the truck. Defendant Gutierrez said they had gone to Michigan and the load had been cancelled. He said that they were going back to New Mexico to pick up a load the following Monday. The officer asked for a bill of lading, which Gutierrez provided. Agent Talbert took the paperwork to his vehicle to examine it. When he reviewed the documents, he noticed on the bill of lading that the load they had taken to Ohio was coming from Ontario, California. The bill of lading indicates that the load was picked up on March 10 in California. In comparing the bill of lading with the logbooks, however, he observed that neither subject showed he had been in Ontario, California, on that date. He noticed other inconsistencies in the log books, including the fact that defendants indicated they had gone to Reading, Pennsylvania, and the load was to go to Toledo, Ohio. That seemed suspicious to him, given that they would have had to drive through Ohio to get to Pennsylvania. He also observed that in one logbook, it showed downtime in Pennsylvania. The logbooks did not match, such as one showing

they were going from Ohio to Oklahoma, and the other that they were going to Arizona. One of them never indicated that they been to Michigan. Things just didn't seem quite right. On March 15, the logbook showed that Gutierrez had been off duty for 7 days, which was inconsistent with picking up a load in California on March 10. Both showed downtime in Phoenix. Significant downtime is suspicious to him because usually a normal trucking operation will have its schedule planned without downtime and with a load set up wherever they go. Because of the inconsistencies, Agent Talbert made contact with Sergeant Funderburk to assist him with the stop. Sergeant Funderburk is a uniformed member of the Missouri State Highway Patrol.

After he arrived and Agent Talbert had pointed out the inconsistencies to him, Sergeant Funderburk made contact with the drivers. Agent Talbert was there when he made contact, present when consent to search was given, and assisted him with searching the vehicle. The drivers were outside of the truck on the passenger side. Gutierrez had asked him if he could put his boots on, as it was cool that day. They let him do so. He sat in the passenger seat while he put his boots on. They were looking around the interior of the vehicle, and Agent Talbert saw that the screws had been taken out around the map lights. He mentioned it to Sergeant Funderburk. He attempted to remove the light bracket, which is part of the normal procedure when searching. They needed a tool to remove the screws, and found a Phillips screw driver to take the screws out of the light. Defendants were standing beside the truck at this time. Neither one limited or withdrew their consent to search. The officers pulled down part of the light fixture, and observed a black bag and green bundle hidden inside. When they looked up, defendants had fled.

On cross examination, Agent Talbert testified that he had planned on doing a walk-around inspection, but he did not actually do that roadside. Before Sergeant Funderburk arrived, he was putting information into the computer and preparing to do the walk-around. Regarding the

discrepancies, he agreed that mistakes are fairly routine, and sometimes he does give drivers opportunities to correct mistakes. He hadn't done so in this case. It seemed that their logbooks indicated they had been on separate trips. He didn't ask how long they had been driving together. He thought if they were going to the same place, they would have the same information in their logbooks. He didn't ask Gutierrez if he'd been in on the delivery from California to Ohio, even though that could have explained some of the discrepancies. The compliance check turned into a criminal investigation when he made contact with Sergeant Funderburk, he arrived, and they discussed the logbooks. When he called him, he had criminal suspicions. He thought the other officer arrived in about 20 minutes. He'd stopped them at 6:30 and Funderburk arrived about 7:00 a.m. While he waited, he looked at the logbooks and made entries into his computer. The officer explained that he did not recognize the truck because he wasn't familiar with the company itself; this is not unusual. It always piques his interest when a truck is empty. He admitted that it was a Saturday and possible that a truck would be empty on that day. He never told them they were free to leave, and he was holding their drivers' licenses, so they probably would not have felt free to leave. Agent Talbert admitted that Gutierrez's log book did reflect he'd been in Michigan, and that was what he told him. When they went to the vehicle, both officers entered on the passenger's side. Apparently Sergeant Funderburk had asked them for consent to search, and both had apparently consented. He was looking for evidence to explain discrepancies. He was assisting Sergeant Funderburk in a criminal search; this was not part of his commercial duties.

During further cross examination, Agent Talbert testified that he almost always stops vehicles that are unfamiliar to him because they may not have the proper licensing. In his experience, this may be an indicator of drug trafficking. He acknowledged that the only thing he saw in this case was the discrepancies in the logbooks and the bill of lading. They also indicated that had gone to

Michigan to pick up a load, but it had been rejected. With the price of fuel, he believed that drivers would call, rather than drive, to pick up a load that wasn't there. While this may not be illegal, in his experience it is not normal, especially given the price of fuel. So, he had logbook errors, an empty truck, and abnormal behavior, which constituted suspicious activity, based on his experience. He called for back up because the logbooks' anomalies lead him to believe there might be criminal activity going on. Regarding the screws that were around the light that appeared to have been removed, he had no idea when this might have happened, but they were pretty shiny, so he didn't think it was that long ago. It made him suspicious because the screws had been removed, period. Sergeant Funderburk told him to take the screws out. In Gutierrez's logbook, the officer admitted that defendant did properly list his destinations, including Michigan and Ohio. The discrepancies between the two logbooks were the main problem. But, in Gutierrez's case, it shows he's going from Pennsylvania to California, and then the next day going from Ohio to Oklahoma. Defendant Gutierrez had originally told him that he was going to New Mexico. He agreed that it was not necessarily unusual for someone to be heading home on a Saturday to New Mexico for a Monday pickup, but the officer stated that it was not normal to be running on empty for that far.

The government next called Sergeant Matt Funderburk, who works for the Missouri State Highway Patrol. He mainly works patrolling on I-44. On March 20, 2010, he received a call from Rick Talbert about 6:30 a.m. Agent Talbert told him that he had stopped a truck on the interstate and the drivers had some paperwork that he found suspicious. The truck was empty, traveling from Pennsylvania or Ohio or Chicago, but he wasn't sure because of the inconsistencies in the logbooks. He responded to the location to assist Agent Talbert. He arrived on the scene about 7:00 a.m. Agent Talbert was looking at paperwork when he arrived. He briefly examined the documents, and noted the same discrepancies. He then spoke with Gutierrez, the driver of the truck. He asked him where

he was headed and he said they were going to Arizona, and that their load was cancelled in Michigan. Defendant Gutierrez appeared to be nervous; he would not make eye contact and was breathing rapidly. Sergeant Funderburk has made a lot of stops, and this type of nervousness was more extreme, in his personal observation. During a normal traffic stop, the nervousness usually goes away, and it didn't here. He asked defendant if there was anything illegal in the truck, and he responded that there was not. He asked to search the truck and the driver said to go ahead. Less than five minutes had elapsed before he had obtained consent to search from the time he had arrived. There were no limitations on defendant's consent. He had no trouble communicating with Gutierrez. There was no indication of alcohol, and no threats or promises were made. Orozco was still in the sleeper area, Gutierrez was in the driver's seat, and Agent Talbert was outside the vehicle when he asked for consent. Gutierrez seemed to understand what he was asking, and he seemed to be cooperative. They asked them to step out, and then the officers began to search the back area of the truck. Defendants stood outside on the passenger side. When searching, they noticed two light fixtures on both sides of the cab, and there were screw marks on the screw heads of those fixtures. At some time during the search, Gutierrez was allowed back into the vehicle to put his shoes on. They could not remove the screws because they seemed to be stripped. They found a screw driver in the vehicle, and removed the screws. Defendants were outside the vehicle, but then they fled the scene. Before this, neither one withdrew the consent to search or placed any limitations on it. He had no discussion with Orozco other than asking him to get out of the truck.

On cross examination, Talbert told him, when he called, that he had stopped a commercial vehicle on the interstate, that the driver was nervous, and there were inconsistencies in the log book. He is experienced enough to observe obvious discrepancies in the log books, but he relies on Talbert's expertise. He briefly examined the documents Talbert provided, but only saw the

discrepancies he pointed out.  He concurred with the analysis.   There were a lot of discrepancies about the previous load, and it appeared to be overly suspicious.  When he approached the vehicle he intended to search it.  He approached on the passenger's side, and asked Gutierrez for consent to search. They were looking for tampering of the vehicle and evidence of contraband, such as drugs or weapons.  He doesn't always search, but in this case, because of the discrepancies, including downtime prior to taking the trip east, which is a big indicator that he has seen in the past, and the differences in logbooks, nervousness, the bill of lading, based on his experience, he wanted to search the vehicle.  He agreed that nervousness is not unusual, and it does not always subside.  Nervousness, however,  can be an indicator of criminal activity.

On further cross examination, Sergeant Funderburk stated that he did not have any conversation with Orozco.  Other than thinking that he was pretending to be asleep, he didn't notice anything unusual.  From what he understood, Officer Talbert had not had any conversation with him either.

Initially, the law is clear that probable cause is not needed to stop a commercial motor vehicle for inspection.  United States v. Mendoza-Gonzalez, 363 F.3d 788, 794 (8th Cir. 2004).  The Supreme Court has held that "a warrantless search of property in certain closely regulated industries is constitutional if the rules governing the search offer an adequate substitute for the Fourth Amendment warrant requirement."  Id. at 793-94.

In this case, a full review of the testimony adduced at the suppression hearing indicates that the vehicle in question was a commercial motor vehicle, and that the officer was acting within his authority and discretion when he stopped it.  Although he noticed an unfamiliar name on the truck, he had the authority to stop it, regardless, as part of his duties as a commercial motor vehicle inspector.  There is no question that he made a valid traffic stop, and that once a routine traffic stop

occurs, the investigating officer is entitled to conduct an investigation reasonably related in scope to the circumstances that justified the initial stop. Terry v. Ohio, 392 U.S. 1 (1968); United States v. Ehrmann, 421 F.3d 774, 780 (8th Cir. 2005). It is also clear that where an individual is detained after an initial lawful stop, the question is whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990). Law enforcement officers are entitled to stop and briefly detain an individual for investigative purposes if there is reasonable suspicion that criminal activity may be afoot. United States v. Hill, 91 F.3d 1064, 1069 (8th Cir. 1996). A police officer may also run a computer check to establish whether the vehicle might have been stolen or whether there are outstanding warrants for any passengers in the car. See United States v. McManus, 70 F.3d 990, 993 (8th Cir. 1995); United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995). Additionally, if the responses provided give rise to suspicions unrelated to the traffic offense, the officer's inquiry may be broadened. Id. at 357. This includes asking the driver for his license and registration, requesting him to sit in the patrol car, and inquiring as to the driver's destination and purpose. Id. Further, if a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. See United States v. Jones, 269 F.3d 919, 924-25 (8th Cir.2001). The Eighth Circuit has clearly held that, even without reasonable suspicion, if an encounter after a traffic stop's completion is consensual, a law enforcement officer may ask questions unrelated to the traffic stop and request consent to search the vehicle. United States v. Santos-Garcia, 313 F.3d 1073, 1078 (8th Cir. 2002).

Having made a valid stop in this case, Agent Talbert was acting within his authority in inquiring as to the purpose and destination of defendants' trip, and in conducting the compliance inspection. He testified that he was unfamiliar with the trucking company, which is the main reason

he stopped defendants' vehicle. He then developed suspicions about the vehicle and its purpose because of the discrepancies in the logbooks, the bill of lading, and the empty tractor trailer. He called for back-up from the Highway Patrol because he is not authorized to search a vehicle for evidence of criminal activity. During the time that it took Sergeant Funderburk to arrive, Agent Talbert was working on completing the paperwork. There is no basis to conclude that the detention was unreasonably long or intrusive. He stopped the vehicle at 6:30 a.m., and Sergeant Funderburk arrived at 7:00 a.m. The evidence indicates that he obtained consent to search within five minutes. During the ensuing search, until the defendants fled, there is no reason to believe that they were illegally detained or that the detention was unreasonably long.

When considering the totality of the circumstances, the Court finds, moreover, that the testimony adduced at the hearing established reasonable suspicion to conduct a search. Based on the information gleaned from Agent Talbert regarding the suspicious nature of the logbooks and bill of lading, the fact that the truck was traveling without a load, and Sergeant Funderburk's own first-hand observations of the level of nervousness displayed by defendant Gutierrez, there was reasonable suspicion to investigate further. The officer credibly testified that the level of nervousness was unusual, that it was not normal that it did not subside, and that based on the totality of the stop, there were strong indicators of criminal activity. Agent Talbert stated that he was particularly bothered by the fact that there was an empty load, and that unusual driving had occurred, such as passing a destination in Ohio and then returning to it after having gone to Pennsylvania. Both officers testified that the number of inconsistencies in the logbooks, including unusual downtime in addition to different points of origin, stops, and dates when the drivers were supposed to have picked up the load in California, led them to conclude that there was possible criminal activity occurring. Therefore, it is clear that they had reasonable suspicion to search the vehicle.

Additionally, when Sergeant Funderburk requested defendant Gutierrez's consent to search the trailer, there was no evidence that he did not understand the request or voluntarily provide that consent. Further, there was no evidence that either defendant attempted to curtail the search, limit it, or otherwise withdraw consent. There was no evidence adduced at the hearing to suggest that the officers acted in any manner that would suggest deceit, duress, or coercion. For example, when defendant Gutierrez asked to be able to put his boots on because he was cold, he was allowed to sit in the truck and do so. Further, there is nothing to suggest that the search and seizure exceeded the scope of the consent to search given by defendant. Accordingly, the Court finds that there was reasonable suspicion of criminal activity to justify further investigation, and that the subsequent search of defendants' vehicle was permissible as a consensual search.

Based on a full review of the evidence in this case, the Court finds that the officers acted within their legal authority; that the traffic stop and questioning were constitutionally valid; that the officers had reasonable suspicion to request consent to search; and that the search was consensual. Therefore, it must be recommended that defendant's motion to suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence be denied.

/s/ James C. England
JAMES C. ENGLAND
United States Magistrate Judge

Date: 3/30/11